# L.

## Case No. 7,959.

LABAREE et al. v. PEORIA, P. & J. R. CO.

[3 Ban. & A. 180;[1] 10 Chi. Leg. News, 227.]

Circuit Court, N. D. Illinois. Dec., 1877.

PRINCIPAL AND AGENT — POWER OF ATTORNEY — SALE BY PRINCIPAL OF SUBJECT-MATTER — PATENTS — WHETHER SALE BY OWNER REVOKES POWER OF ATTORNEY.

1. The presumption is that a sale of letters patent puts an end to powers of attorney relating thereto previously executed; but if such a power of attorney is allowed to remain outstanding, and third parties deal with the attorney on the supposition that it is still in force, they will be protected as against the owner of the patent, for, if one trusts an agent, and in consequence thereof, another suffers, the party conferring the agency must bear the loss.

2. A court of equity will look at the real state of the case, and regard that as done which ought to be done; so that, if a contract is actually made by which the owner of a patent is bound, a court of equity will disregard the form of its execution.

¹ [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

One of the complainants, [Henry D.] Dunbar, having invented an improvement in pistons and piston-packing for steam engines, on August 14th, 1860, obtained letters patent [No. 29,576] therefor, and on March 19th, 1861, conveyed to one Parker Wineman his rights in the patent, so far as concerned its use upon locomotives on railroads having their principal offices in the state of Illinois for the full term of the patent, subject to a royalty of $25, reserved by the inventor, for each locomotive upon which Wineman should authorize the patented article to be used. On the occasion of the first sale of the right being made by Wineman under his conveyance, the railroad company to which he sold demanded authority to use the improvement under any extension of the patent which might thereafter be granted to the patentee or his assigns. Wineman having no right to grant this authority, Dunbar joined with him in the execution of the license to that company, and to obviate the necessity of his so joining in cases of future sales, he gave Wineman a power of attorney, March 8th, 1862, authorizing the latter to attach the former's signature to any

agreement he might make in regard to a license of the use of the invention under an extension of the letters patent, it being understood between them, however, that such extension should not be contracted for except where specifically required by the railroad companies to whom Wineman might effect a sale. On January 7th, 1863, a new contract was entered into between them, under the terms of which Dunbar's royalty was reduced from $25 to $10 per locomotive, the new agreement embodying a clause specifically authorizing Wineman to vend the use of the patent in Illinois, for the full term of the letters originally issued and also for the period of any extension thereof which might be granted. In May or June, 1863, Dunbar repurchased of Wineman all the rights previously acquired by the latter, giving him notes to the amount of $2000 therefor. Wineman, however, retained possession of the power of attorney of March 8th, 1862, which had never been placed on record or out of Wineman's control. On September 21st, 1863, Dunbar, finding that he could not pay his notes as they matured, and being disappointed as to certain sales in Illinois which he had hoped to make, gave Wineman $500 in money, and full rights on the patents in Illinois, free from royalty, for a surrender of his indebtedness.

It appears, though not without denial, that at this time a conversation occurred between them in reference to a future extension of the patent, which resulted in an understanding that as Wineman continued to hold Dunbar's power of attorney of March 8th, 1862, he should use it when necessary, and the right to license the use of the patent after the original term had expired need not be incorporated in the conveyance of September 21st, 1863—leaving that right to be exercised or not as the purchasers might require. The right to so license the use of the patent for an extended term was not, in terms, conferred upon Wineman by the conveyance then executed. On September 23d, 1863, Dunbar assigned a half interest in the patent, and in any extension thereof, to his co-complainant [John W.] Labaree. In January, 1865, Wineman wrote to Dunbar: "I have sold to six roads and none of them have the extension * * * of course they will have to get it from you. * * * From all the roads you can realize a good many thousand dollars, if you get your invention extended." On March 25th, 1867, Wineman sold to the defendant, the Peoria, Pekin and Jacksonville Railroad Company, the right to manufacture, apply and use the invention upon all its locomotives and engines of every kind, for which the company gave him its promissory note for four hundred dollars payable in sixty days. The note provided that if paid at maturity, Wineman should execute and deliver to the company a good and sufficient conveyance of the right to use the patented article on its engines and "all the right, title, and interest of the said Parker Wineman, in said invention, so far as the same is applicable to the uses of said company, during the full time of the continuance of said letters patent and of any extension of time which may hereafter be made." The note being paid at maturity, Wineman returned it to the company, and at the same time delivered to the latter a license executed in his own name, omitting a clause specifically or by implication conferring upon the company any rights other than for the term of the original patent. On August 14th, 1874, the term of the original letters patent having expired, the complainants on that day obtained an extension for seven years. On March 2d, 1876, Wineman executed a paper purporting to convey to all railroads, to which he had theretofore issued licenses, the rights to use the patented article for the extended term as fully as though the extension had been mentioned in the original deeds to them. Afterward (the date not appearing), Dunbar, by service of notice upon Wineman, attempted to revoke the power of attorney of March 8th, 1862. In this state of the case, the defendant having continued to use the Dunbar invention upon its locomotives after the original letters patent expired, in some cases manufacturing and using new pistons after that date, a bill was filed for an accounting and for an injunction to restrain the alleged infringement of the complainants' rights under the extension of August 14th, 1874. No claim was alleged against the defendant for its use of the patent during the original term. The motion for an injunction was not pressed until a hearing upon the bill, answer and proofs.

The defendant relied upon its license from Wineman.

Banning & Banning, for complainants, argued that, it being admitted by the defendant that it was using the improvement in pistons for steam engines patented by Dunbar, and had renewed the same on some of its locomotives since the expiration of the original patent, the only question was whether the defendant was authorized, under the license from Wineman or its agreements with him, to use the patented device during the extended term of the patent. They insisted that:

1. The assignment of September 21st, 1863, for the original term of the patent, was the only paper in force after its date under which Wineman had any right or authority to act in reference to the patent, and hence that his license to the defendant could only cover the original term of the patent, and not the extension. If this be true, then any renewal of the patented device after the expiration of the original term was unauthorized and an infringement of the patent. Curt. Pat. §§ 198–210.

2. The power of attorney of March 8th, 1862, was not in force at the time the defendant received its license from Wineman, but had become extinguished by the assignment of January, 1863, and subsequent agreements of that year. 2 Bl. Comm. 177; Farw. Powers, 23-28, 83; Wheate v. Hall, 17 Ves. 80; Story, Ag. §§ 486-489; 2 Liv. Ag. 306; Sugd. Powers, 54; 4 Kent, Comm. 346.

3. But even if such power of attorney continued in force, Wineman had never properly exercised his authority under it to grant a license to the defendant for the extended term of the patent. The licenses offered in evidence had been signed in his own name, and not in Dunbar's name by him as attorney in fact, and were, therefore, his own deeds, and not the deeds of Dunbar. Story, Ag. §§ 147-165, and notes; 3 Am. Jur. 65-87.

4. The defendant had acquired no new rights under the confirmatory license of March, 1876, because: (1) It paid no new consideration for it. (2) It then had full notice of complainant's rights. (3) It was not delivered until after Dunbar had revoked the power of attorney. (4) It was merely the deed of Wineman and not of Dunbar.

McCagg, Culver & Butler, for defendant, contended that the defendant, in good faith, asked for, bought and paid for the right to use the patented device on its road, as well for the term of the extension of the letters patent as for the original term. The main question was: Had Wineman authority from Dunbar to convey it? They argued that:

1. When Wineman, with the power of attorney in his possession, sold back to Dunbar all his rights in Illinois, perhaps, by operation of law, the power of attorney was revoked, but when Dunbar reconveyed to the former, with renewed privileges, it was treated as continuing in force. They thereby gave it new life; it was coupled with an interest in Wineman; and Dunbar had no power to revoke it without the former's consent.

2. But even if it did not continue in force as between the parties to it, yet, as to third persons dealing with reference to the authority it purported to confer upon Wineman, while still in his hands, it remained in full force and effect. Beard v. Kirk, 11 N. H. 397.

3. Although it is true that the license to the defendant was executed in the name of Wineman alone, when his authority was to use Dunbar's name, yet (1) a court of equity will regard that as done which ought to be done; and (2) Wineman's authority having been shown to have been coupled with an interest, it was properly executed in his own name. Story, Ag. § 164, 483.

DRUMMOND, Circuit Judge. It is rather difficult to determine what are the actual facts in this case, upon which the controversy arises, and I have come to the conclusion that I will decide it in favor of the defendant, on the ground that the plaintiffs have, by their conduct and action, enabled their agent, Wineman, to make a contract with the defendant under such circumstances that it had the right to assume that he was properly representing the patentee. It is not easy to reconcile all the various facts that appeared in the case, and that are stated by the two principal witnesses, Dunbar and Wineman, but conceding that the interest of Wineman in the subject matter of the patent was terminated by the repurchase by the patentee, Dunbar, of the right to the patent in the state of Illinois, I am inclined to think that when he sold again to Wineman, it was contemplated by the parties that the latter should have the same right he previously had over the patent in the state of Illinois, namely, that he should have the right to the use of the patent, during the life of the original patent, and during its extension. I concede the presumption is that when the resale of the right in the state of Illinois took place, when the right was reinvested in Dunbar. it put an end to the assignment that had been made to Wineman by Dunbar, and also to the power of attorney that had been executed, and that something beside must take place in order to re-clothe Wineman with the right vested in him by the power of attorney. It is certain that when Dunbar made the last transfer to him, he did not, by its terms, vest in the agent any right which might exist in the patentee by virtue of the renewal of the patent. But it is stated by Wineman, and I am inclined to think the statement is true, that when the attention of Dunbar was called to the fact that the extension was not mentioned in the deed. he spoke of his still having the power of attorney. We may assume, under all the circumstances of the case, that Dunbar knew that the power of attorney still remained in the hands of Wineman. and although, as a matter of law, its power might be spent, still we must visit upon Dunbar some of the consequences of his allowing it to remain in the hands of Wineman. He ought to have taken it up; then there would not have been the same effect given the testimony that I am bound now to give it. in consequence of the power being permitted to remain in the possession of Wineman. According to the testimony of the latter. Dunbar said, in effect: "It is possible that the roads will not ask for the use of the patented device during the extension, and if they do not, then you need not grant it to them, but if they do, you have the power of attorney and you can use it; you can give it to them." This is often reiterated with every variety of phrase and form in the testimony of Mr. Wineman, and his testimony is rather more distinct and ex-

plicit than that of Dunbar's, that he is, besides a disinterested witness, that is to say, he has no direct interest in this controversy as Dunbar has. The only thing which appears to throw some doubt upon this statement is the letter written by Wineman on the seventh of January, 1865, in which he says: "I have sold to six roads, and none of them have the right of extension. The Great Western, that you and I both sold to, has it, but the six I sold to of course will have to get it from you. I think it is a good job; from all the roads you can realize a good many thousand dollars if you get your invention extended."

"If you get your invention extended," so that it is clear that at that time the writer of the letter did not suppose, or he assumed, that it had not been extended; that was a contingency which might or might not happen. In one reading of this communication, and in one view of it, it would seem to be inconsistent with the position which Wineman now maintains, that he had authority, as he had by his original power of attorney, to make grants including the extension.

But, in another aspect, and read in another light, it is possible that it can be reconciled with the other view, and in consideration of all the testimony bearing upon the case, and of this particularly, that if a man trusts an agent and in consequence of the trust another person suffers, the party conferring the agency must bear the loss—the party who has been the means of giving the authority must suffer rather than the other. And again, there is some little significance, I think, in the fact that at a subsequent time Dunbar did revoke, in a formal way, the power of attorney. I do not lay much stress upon the confirmatory statement made on the second of March, 1876, because I assume that it was a contract made by the agent with the defendant that there was to be included, when the money was paid, and it was so understood, the right of the extension as well as the right of the original patent. I dismiss as not worthy of any very serious consideration, the question whether or not Wineman signed the papers in proper form or executed them in a particular way. I do not think it is material, when we look at it as a matter of pure equity, whether he signed it as Wineman, or Dunbar by Wineman. A court of equity will look at the real state of the case, and so regarding it, will consider that as done which ought to be done. So that if a contract was actually made by which Dunbar was bound, and the extension of the patent was intended to be conveyed, a court of equity will treat it as done to carry out the purpose of the parties.

It is a question by no means free from difficulty, but on the whole, I think I shall have to dismiss the bill. Decree accordingly.